#30565-aff in pt & rev in pt-JMK
**2025 S.D. 64**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

RTI, LLC and RTI HOLDINGS, LLC,   Plaintiffs and Appellants,

  v.

PRO ENGINEERING, INC.; DESIGNARC
GROUP, INC.; F.M. ACOUSTICAL TILE,
INC.; TRANE U.S. INC.; and EKERN HOME
EQUIPMENT COMPANY,   Defendants and Appellees,

  and

RE COM, INC.   Defendant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BROOKINGS COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE DAWN M. ELSHERE
Judge

\* \* \* \*

SHAWN M. NICHOLS
ANDREW S. HURD
CLAIRE E. WILKA of
Cadwell Sanford Deibert
 & Garry LLP
Sioux Falls, South Dakota   Attorneys for plaintiff and
   appellant RTI, LLC and RTI
   Holdings, LLC.

\* \* \* \*

   CONSIDERED ON BRIEFS
   AUGUST 27, 2024
   OPINION FILED **11/12/25**

* * * *

GREGORY H. WHEELER of
Boyce Law Firm, LLP
Sioux Falls, South Dakota

Attorneys for defendant and
appellee designArc Group, Inc.


DANIEL R. FRITZ of
Ballard Spahr LLP
Sioux Falls, South Dakota

JUAN M. AVILA
AARON C. ABELLERIA of
Arthur Chapman Kettering
    Smetak & Pikala, P.A.
Minneapolis, Minnesota

Attorneys for defendant and
appellee Ekern Home
Equipment Company.


MARK J. ARNDT
RYAN W.W. REDD of
Evans, Haigh & Arndt, LLP
Sioux Falls, South Dakota

Attorneys for defendant and
appellee F.M. Acoustical Tile,
Inc.


ERIC J. STEINHOFF
BRANDON D. MESHBESHER of
Lind, Jensen, Sullivan & Peterson, P.A.
Minneapolis, Minnesota

Attorneys for defendant and
appellee Pro Engineering Inc.


COURTNEY R. CLAYBORNE of
Clayborne, Loos & Sabers, LLP
Rapid City, South Dakota

MARC M. BERG of
J. Selmer Law P.A.
Minneapolis, Minnesota

Attorneys for defendant and
appellee Trane U.S. Inc.

#30565

KERN, Justice

[¶1.]     RTI, LLC, and RTI Holdings, LLC (collectively RTI), sought to build a clinical research facility (the Facility) in Brookings, South Dakota, to perform animal health research trials.  Due to the nature of the testing, the Facility had unique requirements for air filtration, air flow, and ventilation.  RTI, acting as the general contractor, hired an architect and various contractors to complete the project.  The Facility was completed in April 2016.

[¶2.]     Within months of completion, RTI encountered several issues with the Facility and sued the architect and contractors, alleging breach of contract and breach of implied warranties.  The defendants all moved for summary judgment and soon after, RTI sought to amend its second amended complaint to allow it to assert additional claims against two of the defendants.

[¶3.]     The circuit court granted all defendants' motions for summary judgment, concluding that RTI's claims were based on professional negligence and therefore required expert testimony and that RTI's CEO, Rolland Nevins, lacked the necessary qualifications to provide the requisite expert testimony.  The circuit court also denied RTI's motion to amend the complaint, finding it untimely and the proposed amendments futile.  RTI appeals the dismissal of its claims and the denial of its motion to amend.  We affirm in part and reverse in part.

**Factual and Procedural Background**

[¶4.]     RTI is involved in research in the animal health industry, performing testing and trials for customers seeking to test various animal products, including the testing and development of animal vaccines.  RTI sought to build a new clinical

-1-

research Facility with individually ventilated rooms.  The Facility was to be USDA BSL-2 certified and therefore had to meet specific requirements, particularly as to air filtration and flow to prevent cross-contamination.[1]

[¶5.]        RTI acted as the general contractor for the project, with Nevins in charge of the day-to-day construction details.  Through a verbal agreement, RTI hired designArc as the architect for the project.  RTI also hired various contractors for the project, including Pro Engineering, Inc., to design the HVAC system; Ekern Home Equipment Co. (Ekern), to install the HVAC and plumbing; and FM Acoustical Tile (FM) to install the ceiling.  Ekern subcontracted with Trane U.S. to provide and install the HVAC equipment and with ReCom, Inc., to test and balance the HVAC system.[2]  RTI later entered into a service agreement with Trane under

---

1.        Biosafety Level 2 (BSL-2) "is suitable for work in clinical, diagnostic, teaching, research or production facilities involving agents of moderate potential hazard to personnel and the environment."  Under BSL-2:

>        (1) laboratory personnel have specific training in handling pathogenic agents and are directed by competent scientists,
>
>        (2) access to the laboratory is limited when work is being conducted, and
>
>        (3) certain procedures in which infectious aerosols are created are conducted in biological safety cabinets or other physical containment equipment.

        U.S. Dep't of Health and Human Services et al., *Biosafety in Microbiological and Biomedical Laboratories* 37 (6th ed. 2020), Biosafety in Microbiological and Biomedical Laboratories (BMBL) 6th Edition | CDC Laboratories.

2.        ReCom settled with RTI prior to the summary judgment motions and is not part of the appeal.

which Trane agreed to inspect and provide maintenance for the HVAC system at the Facility.

[¶6.] RTI alleged that the Facility required an air filtration system that would filter the air both entering and exiting the testing rooms to capture contaminants/infectious agents using HEPA filters.[3]  In particular, the Facility required clean air to flow from a clean air hallway to the animal testing room, and then the dirty air was to flow to a dirty air hallway to be filtered out of the Facility. The air pressure system was key to the desired air flow pattern.

[¶7.] Problems with certain aspects of the Facility arose soon after construction was completed in April 2016.  Contrary to its initial understanding of the project specifications, RTI claimed it learned that if it adjusted the air pressure in individual rooms, the entire system would have to be rebalanced, which would take two to three days each time an adjustment was made.  To address this issue, RTI determined that the Facility required pressurization monitors or sensors, which were not originally recommended.  The pressurization monitors were installed in November 2016 at an additional cost of approximately $35,000, and the air pressure system began operating as intended, without rebalancing.

[¶8.] However, RTI then noticed that when the air pressure of individual rooms was adjusted, the suspended ceiling would move up and down, which allegedly caused wires to snap and a portion of the ceiling in some of the testing

---

3. A "HEPA" filter is a high efficiency particulate air filter.  According to the Environmental Protection Agency, "This type of air filter can theoretically remove at least 99.97% of dust, pollen, mold, bacteria, and any airborne particles with a size of 0.3 microns (μm)."  *See* https://www.epa.gov/indoor-air-quality-iaq/what-hepa-filter (last visited Nov. 6, 2025).

rooms to collapse. RTI alleged that after the pressure sensors were installed, additional air ducts and valves had to be installed to connect the main HVAC system to the clean corridor's separate HVAC system, at an additional cost to RTI.

[¶9.] After construction was completed, RTI contracted with Pacific GeneTec (PGT) to develop a poultry salmonella vaccine. Although RTI's Facility was designed to eliminate risks of contamination, it became clear while performing the PGT studies that there was a contamination problem in the Facility, causing delays and repeat studies for which RTI would not be paid. PGT eventually terminated their contract with RTI, which RTI alleged was caused by the multiple system failures and the need to repeat studies due to the contamination.

[¶10.] RTI investigated the cause of the contamination and conducted a smoke study, which determined that the air was flowing in the wrong direction—backwards from the dirty air room into the clean room. RTI alleged that Trane wired the primary controllers of the HVAC system backwards, which caused the incorrect airflow. Once Trane corrected the issue and rewired the controllers, no further contamination occurred. RTI also alleged that this backwards wiring caused the problems with the ceiling.

[¶11.] RTI sued, and in its second amended complaint, alleged breach of contract and breach of implied warranties against all defendants. RTI's specific factual allegations against each defendant vary, however, and are detailed below.

### *RTI's claims against designArc*

[¶12.] RTI hired designArc, which had prior experience working on a clean lab with BSL-2 requirements, to provide architectural and design services and to

assist RTI in performing certain other related services during construction. RTI alleged that designArc recommended a suspended vinyl ceiling for the Facility, but that it failed to determine, in consultation with Pro Engineering, the ceiling specifications required to withstand the changes in air pressure or to recommend ceiling products in compliance with those requirements. RTI alleged that the suspended ceiling moved up and down due to the air pressure changes, which eventually caused the ceiling to collapse, necessitating replacement of the suspended ceiling with a hard ceiling in several of the animal testing rooms.

### *RTI's claims against Pro Engineering*

[¶13.]     Pro Engineering was hired to design the electric, plumbing, waste, vent, and domestic water systems, and to provide the design for a new HVAC and duct system. RTI claimed that it informed Pro Engineering that the Facility must be designed so that the direction of the airflow could be changed in each room in the Facility. Pro Engineering allegedly assured RTI this was possible without installing hard-wired pressurization monitors, which would have cost almost $64,000.

[¶14.]     Nevins explained that Pro Engineering's "engineering design and specifications for setting of the system did not achieve RTI's requested system need for airflow direction and ability to adjust pressure within rooms as needed." In particular, RTI alleged:

> The system did not tie in the clean corridor to the animal rooms and dirty corridor for the ability to maintain and/or change air pressure. Pro Engineering's plans did not give proper specifications for the equipment needed to precisely adjust. Clean hallway system was not filtered nor was volume regulation. Improper instructions were given as to how the

system was to be balanced. No allowance for changing of office and shower area pressures.

[¶15.] Nevins further explained that Pro Engineering's plan was inadequate for RTI's purposes because it could not easily switch the airflow set up. Nevins claimed that although Pro Engineering was a participant in the meetings in which the type of ceiling was discussed, it never informed RTI that air pressure changes would affect the suspended ceiling. According to Nevins, Pro Engineering agreed with the recommended suspended ceiling, because it understood that "hard ceilings have been knocked down because of air pressure." RTI claims Pro Engineering assured RTI that it would be able to change the airflow in one room and not another, but Pro Engineering did not inform RTI that it would have to rebalance the system each time the airflow was changed. To remedy that issue, RTI had pressure sensors installed in each room, which cost approximately $35,000.

### RTI's claims against FM Acoustical

[¶16.] FM provided a bid to install a suspended ceiling. Although designArc had recommended a vinyl-type ceiling, FM recommended an all-aluminum suspended ceiling, either with or without a gasket. RTI selected the all-aluminum with gasket ceiling recommended by FM, which later installed the ceiling. RTI claimed that due to FM's improper design and installation, the air-flow system did not operate as intended under the contract. RTI alleged it "contracted for a system that would allow each room's airflow and pressure to be adjusted." More specifically, RTI "required the animal room to have negative air pressure, so when the animal room's door opened to the clean corridor, only clean (noncontaminated) air would flow into the animal room." RTI claimed that "[f]aulty design or

installation of ceilings in test spaces allowed for air leakage and therefore bacterial, viral, and other contaminants being released." Further, RTI alleged that "the ceiling support grid began to fail and collapse due to changes in air pressure."

[¶17.] Nevins admitted in his deposition that FM was not involved in the design phase of the Facility and that the decision to use the suspended/drop down ceiling was made prior to FM's involvement. Nevins instead faulted FM's installation of the ceiling, claiming some of the suspension wires were not connected, some tiles were not clipped fully or at all, and there were gaps around the outside framing, which Nevins attributed to FM's deviation from written installation instructions. Nevins was unaware if the materials FM used were defective or faulty.

[¶18.] According to Nevins, the "big issue" with the ceiling is that portions of it collapsed. Prior to the collapse, Nevins testified he and Ekern could see the ceiling moving up and down. Later, he saw that "wires were actually snapping" and they observed that when "the ceiling would move up, wires would get loose, and the pressure valves would adjust and the ceiling would drop quickly."

### RTI's claims against Trane and Ekern

[¶19.] RTI had prior experience working with Ekern on a remodeling project and hired Ekern to provide the materials and labor for the HVAC and plumbing systems needed for the Facility. Ekern, in turn, hired Trane as its subcontractor to provide and install the HVAC portion of Ekern's contract. RTI did not have an agreement with Trane until they entered into a scheduled service agreement after construction was complete.

[¶20.]      RTI's claims against Trane arise out of the alleged faulty installation of the HVAC system and provision of equipment unsuitable for RTI's needs.  More specifically, RTI claimed there was "an improper set-up of the pressure system, an improper wiring of [the] primary pressure controller for the dirty corridor, improper air pressure adjustment equipment that gave false readings and extreme adjustments, and an air system leakage to the extent that there is excess pressure build up in areas."  RTI maintains that Trane wired the air pressure controller box backwards, causing the air to flow in the wrong direction, and asserts that Trane admitted to doing so.

[¶21.]      At his deposition, Nevins explained that the "primary complaint with Trane was the incorrect wiring of the clean hallway controller."  Nevins explained:

> Specific to Trane, one item was that they reversed the connections on the primary controller for – on the controller for the dirty hallway, which was the lead sensor in which all other controllers reacted to – not controllers.  It was the lead adjustment in air pressure for which then all other controllers would react to in accordance with the air pressure off of that sensor.

In addition, Nevins claimed:

> It appeared that the [variable air volume "VAV"][4] boxes were inconsistent in how they adjusted, in which they sometimes would adjust at a normal speed and other times they would

---

4.    "VAV systems supply air at a variable temperature and airflow rate from an air handling unit (AHU).  Because VAV systems can meet varying heating and cooling needs of different building zones, these systems are found in many commercial buildings.  Unlike most other air distribution systems, VAV systems use flow control to efficiently condition each building zone while maintaining required minimum flow rates."

https://www.pnnl.gov/projects/om-best-practices/variable-air-volume-systems#:~:text=VAV%20systems%20supply%20air%20at,a%20perimeter%20zone%20with%20windows (last visited Nov. 6, 2025).

either – for some reason, they would all of a sudden make the adjustment. . . .

[I]t appeared that that VAV was not adjusting at the right speed. It would be sometimes too fast.

[¶22.] In regard to Trane's alleged breach of implied warranties of merchantability and fitness for a particular purpose, RTI alleged:

> Trane holds itself out as a merchant with expert knowledge and skill related to specialized HVAC systems and controls for facility projects. Due to the continued contamination, improper wiring, and air pressure problems, Trane's HVAC equipment and controls installed in [RTI's] facility are not fit for their ordinary purpose. [RTI] also relied on Trane's skill or judgment to provide and install the HVAC equipment and controls for its Project at the facility. Trane was aware that the Project needed equipment that would avoid airflow contamination and that allowed for air pressure to be controlled in the individual facility rooms. The HVAC equipment and controls provided and installed by Trane were not properly installed for their intended purpose, which has caused and continues to cause damage to [RTI's] facility and with prospective projects at the facility.

[¶23.] The same general allegations were made against Ekern, but RTI later alleged that Ekern was vicariously liable for Trane's improper installation of the equipment. Nevins testified that either Ekern or Pro Engineering was supposed to hire a firm to test the system and conduct system balancing. RTI did not assert that there were any problems with the plumbing services Ekern provided, and Nevins indicated that RTI was satisfied with Ekern's labor on the project.

[¶24.] Nevins believes the contamination that occurred in the Facility was due to Trane's improperly installed controls. Nevins claimed Trane is liable to RTI for the cost of the repairs necessary to fix the air pressure issues, although at the time of his deposition, RTI had not obtained an estimate for the cost of repairs.

[¶25.] RTI sought damages from the defendants for the "contamination of studies, interruption of studies, loss of customers, business interruption, lost profits and other losses." It also claimed it was "shorted the contractual delivery of an adequate and working airflow system and will sustain damage and detriment correcting and fixing the same." RTI claimed the "Defendants are jointly and severally liable for damages" including, the cost of ceiling repair and replacement, the cost of repeated clinic trials for PGT, unpaid work RTI did for PGT, loss of income from incomplete and cancelled studies, loss of income from room unavailability, loss of revenues from the PGT project, and additional expenditures to fix the system so that the air pressure could be adjusted.

### *Motions for summary judgment and motion to amend complaint.*

[¶26.] All the defendants moved for summary judgment. Pro Engineering and designArc argued that RTI's claims were grounded in the professional duty owed by these entities respectively, as the engineer for the HVAC system and the architect for the project. These two defendants argued that expert testimony was necessary to establish the standard of care for the particular design and installation work completed on the project. Additionally, designArc argued it did not breach the agreement with RTI and that there is no claim for breach of implied warranty against an architect. Pro Engineering similarly argued that RTI failed to identify how it purportedly breached the agreement with RTI.

[¶27.] FM maintained that RTI needed an expert to support its claim that the ceiling materials and installation of the materials were defective and that the ceiling materials were the cause of any damages RTI claimed. FM also argued that

RTI's damages were speculative. Ekern claimed there were no issues regarding its work on the Facility, and therefore, no breach of contract, and that RTI needed expert testimony to support its claims.

[¶28.] Unlike the other defendants, Trane did not base its summary judgment motion on professional negligence and lack of an expert. Rather, it argued that RTI's claims for breach of contract and breach of implied warranties failed for three reasons: Trane was not a party to RTI's contract with Ekern, RTI disavowed any claim that Trane breached the contract, and RTI admitted the products provided by Trane performed properly. Trane also argued that the breach of implied warranties claim was barred by the terms and conditions of Trane's agreement with Ekern.

[¶29.] RTI submitted a combined opposition to all the defendants' motions for summary judgment, denying that expert testimony was required and averring that if it were, Nevins was qualified to provide such testimony. RTI did not, however, specifically address the grounds raised in Trane's motion for summary judgment. In addition, after the summary judgment motions were filed, but prior to the circuit court hearing those motions, RTI moved to amend its second amended complaint. In its proposed third amended complaint, RTI sought to add a claim that it labeled "negligence" against Trane, alleging the "contractual services performed by [Trane] failed to conform with the services contracted for, and constitutes a breach as to the obligations owed to Ekern" and that RTI is "a foreseeable third party injured by the breaches of [Trane]." In addition, RTI's proposed amendment alleged that as "an actual legal and proximate result of [Trane's] negligence, Plaintiff has suffered

damage." RTI also sought to hold Ekern vicariously liable for Trane's alleged negligence.

[¶30.]    In support of its motion to amend, RTI argued:

> In this case the contract claims against the ReCom and Trane Defendants asserted in the Second Amended Complaint, are more appropriately characterized as negligence claims, as these Defendants were subcontractors of Ekern Home Equipment Company. As demonstrated in our combined brief in resistance to motion for summary judgment, breach of contract as to one party, constitutes negligence as to a foreseeable third party, who is not a party to the contract. Further, Ekern as the party that hired these two entities would be vicariously liable for their negligence. As such, the pleadings in this case should conform to the actual legal relationship between the parties in this case and the Amendment should therefore be granted.

[¶31.]    At the hearing on the motion for summary judgment and motion to amend, designArc, Pro Engineering, FM, and Ekern maintained that RTI's claims were based on professional negligence and required expert testimony to prove them. Counsel for Trane took a different approach, stating, "Trane's coming here today to argue for summary judgment dismissal of the claims that were actually pled in this case and not some other claims that are not yet before the Court." Trane argued that its request for summary judgment on the breach of contract claim was unopposed.

[¶32.]    In response, RTI maintained that an expert was not required because the issues were not beyond a layperson's comprehension and that if an expert were necessary, Nevins was qualified to offer testimony on those issues. Counsel for RTI stated, "whether we call it a negligence claim or breach of contract claim, it's all the same thing," and argued that RTI should be allowed to amend the second amended complaint to assert a negligence claim.

[¶33.] The circuit court issued a written memorandum decision, granting summary judgment to all defendants, but addressing each defendant's motion for summary judgment in turn. As to designArc, the circuit court stated, "RTI makes claims against designArc for breach of contract which is essentially a professional negligence claim and breach of implied warranty." The circuit court noted that while designArc identified an expert to testify that "designArc complied with the professional standard of care," RTI offered only Nevins, whom the circuit court found was not qualified to offer expert testimony on the "proper standard of care" for an architect.

[¶34.] The court also concluded that RTI's lack of expert testimony was fatal to RTI's claims against Pro Engineering, stating, "this type of professional negligence claim requires expert testimony to establish what the standard of care is, how the defendant's design breached the standard of care and how the breach also caused the damages that resulted." It reiterated that Nevins was "not qualified as an expert to provide this testimony as required by the law." The court applied this same reasoning in granting Ekern's and FM's motions for summary judgment, additionally noting that Nevins "admitted he was not an expert in ceiling systems."

[¶35.] As to Trane's motion for summary judgment, the circuit court found that RTI never fully responded to Trane's motions, but instead made a motion to amend its complaint to allege that Trane was negligent and that Ekern is vicariously liable for Trane's negligence. And although Trane did not argue that RTI's claims were essentially for professional negligence, which required expert testimony, the court nevertheless granted Trane's motion for summary judgment on

the same basis it granted summary judgment to the other defendants—the lack of expert testimony to support a professional negligence claim. The court ruled, "[a]s has been set forth regarding designArc, Pro Engineering and Ekern, RTI's failure to produce an expert as to why the products provided by Trane were defective or caused the damages that resulted are fatal to their claims and require the [c]ourt to grant summary judgment."

[¶36.] The circuit court also denied RTI's motion to amend the complaint, noting the deadline for amending pleadings had expired, discovery was completed, and the motion was made after the motions for summary judgment were filed. The court also concluded the amendment would be futile "as any amended pleading to allege tortious conduct on behalf of Trane and vicarious liability as to Ekern would not cure the Plaintiff's failure to submit expert testimony."

[¶37.] The circuit court entered judgment in favor of the defendants and dismissed RTI's complaint in its entirety, with prejudice. RTI appeals, raising the following issues, which we restate as follows:

1. Whether the circuit court erred in granting the defendants' motions for summary judgment based on the lack of expert testimony.

2. Whether the circuit court abused its discretion in concluding that Nevins was not qualified as an expert witness.

3. Whether the circuit court abused its discretion in denying RTI's motion to amend the complaint.

**Standards of Review**

[¶38.] We review the circuit court's grant of summary judgment de novo. *See Est. of Olsen v. Agtegra Coop.*, 2024 S.D. 39, ¶ 12, 9 N.W.3d 763, 768. "The circuit

court's denial of a party's request to amend the pleadings is reviewed under an abuse of discretion standard." *Fodness v. City of Sioux Falls*, 2020 S.D. 43, ¶ 32, 947 N.W.2d 619, 630 (citation omitted). "An abuse of discretion is a fundamental error of judgment, a choice outside the reasonable range of permissible choices, a decision, which, on full consideration is arbitrary or unreasonable." *Id.* (citation omitted).

[¶39.] The rules for reviewing the entry of summary judgment under SDCL 15-6-56(c) are well-established:

> Summary judgment is proper where, the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. We will affirm only when no genuine issues of material fact exist and the law was applied correctly. We make all reasonable inferences drawn from the facts in the light most favorable to the non-moving party. In addition, the moving party has the burden of clearly demonstrating an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law.

*Est. of Olsen*, 2024 S.D. 39, ¶ 12, 9 N.W.3d at 768 (citations omitted). However, "[a] belief that the nonmoving party will not prevail at trial is an inappropriate basis for granting summary judgment on issues not shown to be sham, frivolous, or so unsubstantial as to obviate the futility of their litigation." *Dahl v. Sittner*, 429 N.W.2d 458, 461 (S.D. 1988) (citation omitted). "If reasonable persons, upon examining the evidence, might reach different conclusions, a motion for summary judgment should be denied and the case tried on the merits." *Id.* (citation omitted).

## Analysis and Decision

### 1. Whether the circuit court erred in granting the defendants' motions for summary judgment based on the lack of expert testimony.

[¶40.]      On appeal, RTI does not take issue with the circuit court's characterization of its causes of action as sounding in negligence, but instead, argues that expert testimony is not required, and if it is, Nevins was qualified to provide the expert support for its claims. The defendants, except for Trane, continue to argue that RTI's claims are based on negligence, that expert testimony is required, and that Nevins is not qualified as an expert. Trane analyzes whether it was entitled to summary judgment on the causes of action RTI actually pled— breach of contract and breach of implied warranties. Under the circumstances presented here, regardless of whether RTI's action is based on negligence or contract, expert testimony was necessary to establish both breach and causation for its claims against designArc, Pro Engineering, and FM Acoustical.

[¶41.]      We have often expressed the expert testimony requirement in the context of negligence and professional negligence causes of action. *See, e.g.*, *Sheard v. Hattum*, 2021 S.D. 55, ¶ 28, 965 N.W.2d 134, 143 (holding expert testimony is required in a negligence action when the subject matter "is not within the common knowledge or experience of a lay person"); *Luther v. City of Winner*, 2004 S.D. 1, ¶ 9, 674 N.W.2d 339, 344 (holding "expert testimony is required to establish the standard of care for a professional unless the issue is within the common knowledge of the jury" (citation omitted)).

[¶42.] The expert testimony requirement is not, however, limited to negligence actions; it can apply with equal force to a breach of contract claim. *See KOKO Dev., LLC v. Phillips & Jordan, Inc.*, 101 F.4th 544, 551 (8th Cir. 2024) (agreeing that both the breach of contract and negligence claims asserted in a construction case required expert testimony). *See also Nemec v. Deering*, 350 N.W.2d 53, 56 (S.D. 1984) ("In some cases of alleged negligence *or breach of contract* . . . , the plaintiff is required to show by expert testimony that the attorney failed to exercise a reasonable degree of care, skill and dispatch according to the standards of a particular community.") (emphasis added).

[¶43.] In *KOKO Dev.*, the plaintiff sought to develop a 180-acre tract of land and contracted with DW Excavating and Phillips & Jordan, which subcontracted part of its work to others. 101 F.4th at 546. Numerous issues related to the development arose, and KOKO brought suit, alleging fifteen breaches of its agreements with defendants. *Id.* at 550–51. The federal district court of North Dakota granted the defendants' motions for summary judgment on the basis that KOKO's negligence and breach of contract claims required expert testimony, which was not provided. *Id.*

[¶44.] On appeal, the Eighth Circuit Court of Appeals agreed, first noting the general rule regarding the requirement for expert testimony: "Whether expert testimony is essential in a particular case depends upon the facts of that case. The North Dakota Supreme Court has indicated expert testimony is required if the issue is beyond the area of common knowledge or lay comprehension. . . ." *Id.* at 549 (citation modified). The Eighth Circuit determined that "[w]hether these acts and

omissions constitute *breaches of each of the [d]efendants' agreements* with KOKO are technical issues that involve an understanding of infrastructure and engineering, similar to KOKO's negligence claims" and the district court did not, therefore, abuse its discretion in ruling that expert testimony was required. *Id.* (emphasis added).

[¶45.] In *Dan King Plumbing Heating & Air Conditioning, LLC v. Harrison*, a contractor sued for money owed on a contract for HVAC services provided in the defendant's home. 869 S.E.2d 34, 39 (N.C. Ct. App. 2022). The homeowner counterclaimed, alleging the plaintiff breached the parties' contract by "performing substandard work[] . . . on the re-piping and insulation projects." *Id.* at 50. The contractor argued the trial court should have directed a verdict in its favor on the breach of contract claim based on substandard work because the homeowner "did not present any expert testimony showing that the Company's work was substandard." *Id.* The court explained, "[i]n actions for breach of building or construction contracts, a plaintiff may bring a claim for failure to construct in a workmanlike manner." *Id.* Under such a claim, "the law recognizes an implied warranty that the contractor or builder will use the customary standard of skill and care based upon the particular industry, location, and timeframe in which the construction occurs." *Id.* (citation modified).

[¶46.] The court observed, "there are certainly some types of workmanship claims that can routinely be determined by a jury without the aid of an expert. These are matters where the workmanship is so grossly subpar that it is obvious to any layperson that the work does not live up to a professional standard of care." *Id.*

at 52 (internal citation omitted). However, the court concluded "the common knowledge exception d[id] not apply" and "expert testimony was required as a matter of law" to prove the breach of contract claim based on faulty or poor workmanship. *Id.* *See also* 17B C.J.S. *Contracts* § 1004, (May 2025) (explaining that expert testimony is not necessary when the claimed breach is centered on the "terms of the contract and the manner of performance, as a matter within the realm of common knowledge. A combination of lay and expert testimony may suffice to prove a breach of contract in relation to a standard of workmanlike performance, but expert testimony may be necessary when the breach goes to the technical sufficiency" of the work. (footnotes omitted)).

[¶47.] Thus, under either theory of recovery—negligence or breach of contract—expert testimony may be required if the subject matter of the allegations does not fall "within the common experience and capability of a lay person to judge." *Sheard*, 2021 S.D. 55, ¶ 28, 965 N.W.2d at 143 (citation omitted). Because the basis for the circuit court's summary judgment as to all the defendants was the necessity and absence of expert testimony, we consider the allegations against each defendant to determine whether expert testimony was required.

 a. *designArc's motion for summary judgment*

[¶48.] RTI alleges that designArc, which provided architectural and design services, failed to specify ceiling requirements that would withstand the changes in air pressure or failed to determine with Pro Engineering what the requirement would be. As a result, RTI claims the air pressure changes caused the suspended ceiling to move and eventually collapse. DesignArc claims that expert testimony is

needed to establish such allegations because they involve "the professional judgment of the architect and [are] not within the understanding of a nonprofessional witness." DesignArc further alleges that expert testimony is necessary to establish causation for any damages.

[¶49.]     While we have not previously addressed the necessity of expert testimony for an architect's work, other courts have held that expert testimony is required to establish that an architect's conduct failed to comply with the contract or architectural standards. In *Watson, Watson, Rutland/Architects, Inc. v. Montgomery County Board of Education*, 559 So. 2d 168 (Ala. 1990), the school board brought suit against the architect and various contractors and suppliers after the roof of the school leaked. As to the architect, the school board alleged, inter alia, that the architect breached its contract, which required that the architect "make periodic visits to the site and . . . familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an Architect, he shall endeavor to guard the Owner against defect and deficiencies in the work of the Contractor." *Id.* at 170.

[¶50.]     The court explained that the breach of contract claim against the architect required expert testimony to establish:

> [A]n architect is a "professional," and we are of the opinion that expert testimony was needed in order to show whether the defects here should have been obvious to the Architect during the weekly inspections. Just as in cases dealing with an alleged breach of a duty by an attorney, a doctor, or any other professional, unless the breach is so obvious that any reasonable person would see it, then expert testimony is necessary in order to establish the alleged breach. The nature and extent of the

> duty of an architect who agrees to conduct the inspection called for by the subject agreement are not matters of common knowledge. . . .
>
> The breach alleged in this case involved architectural matters that would not be within the common knowledge of the jurors, yet the School Board presented no expert testimony regarding the Architect's inspections and any deficiencies in those inspections. The School Board presented no expert testimony regarding the standard of care imposed within the architectural profession by the weekly inspection provision contained in this contract, and there was no expert evidence that that standard was breached by the Architect.

*Id.* at 173–74 (citation omitted); *see also Guy M. Cooper, Inc. v. E. Penn Sch. Dist.*, 903 A.2d 608, 617 (Pa. Commw. Ct. 2006) (holding that without expert testimony, plaintiff's evidence failed to "indicate how Architect failed to perform under its contract or how its conduct fell short of architectural standards").

[¶51.]     In this case, RTI alleges designArc failed to determine the ceiling specifications required to withstand the changes in air pressure or to recommend ceiling products in compliance with those requirements. RTI alleges the suspended ceiling designArc recommended moved up and down due to the air pressure changes, which eventually caused the ceiling to collapse, necessitating replacement of the suspended ceiling with a hard ceiling in several of the animal testing rooms. These claims are beyond the common experience and/or capability of average laypersons, who would lack the necessary knowledge regarding the proper design of such a Facility with unique requirements. Further, an average layperson would lack the requisite knowledge to understand how or why the air pressure changed in the Facility, the choice of ceiling materials selected for the Facility, or how the existing ceiling might be impacted by air pressure changes. We, therefore, conclude

that expert testimony was necessary to establish that designArc breached its obligations to RTI and that any breach caused damage to RTI. Without the requisite expert testimony, RTI cannot establish the elements of its claims against designArc and the court properly granted summary judgment in favor of designArc.

### b. *Pro Engineering's motion for summary judgment*

[¶52.] Pro Engineering designed the HVAC, duct, and electric systems for the Facility. RTI alleges that Pro Engineering advised RTI that the air pressure in the individual rooms of the Facility could be adjusted without having to install room pressurization monitors. This advice proved inaccurate, requiring the installation of additional pressurization monitors at an additional cost to RTI. The circuit court found that the allegations against Pro Engineering that related to "proper ventilation, movement of air, reverse flow, balancing system, [and] pressurizing" are beyond a layperson's understanding and that, consequently, RTI's claim against Pro Engineering required expert testimony.

[¶53.] In *Luther*, a case alleging negligent design and construction of a sidewalk against a city engineer, we held that "expert testimony is required to establish the standard of care for a professional unless the issue is within the common knowledge of the jury." 2004 S.D. 1, ¶ 9, 674 N.W.2d at 344. We affirmed the circuit court's entry of summary judgment in favor of the engineer, concluding the plaintiff was required to produce expert testimony to support his claim of professional negligence. *Id.* ¶¶ 11, 16, 674 N.W.2d at 344–46. We reasoned:

> Although it is a close question because a step in a sidewalk is an obvious obstruction, but easy to overlook or forget, Luther's failure to present expert testimony on the professional standard of care for an engineer is fatal to his claim against Britton.

> While these assertions may create a genuine issue of material fact as to whether the step was properly marked, without expert testimony, there is insufficient evidence to indicate that Britton's design and construction were negligent.

*Id.* ¶ 12, 674 N.W.2d at 345. While the claims in *Luther* were grounded in negligence, it is nevertheless instructive on the type of claims requiring expert testimony.

[¶54.] Here, RTI's claims against Pro Engineering are even more technical than the claims in *Luther*, as they center on the ability to control the airflow direction and adjust the air pressure as needed within the rooms of the Facility. While the direction of airflow is within the comprehension of laypersons, the design and equipment necessary to accomplish this type of control is not. The complexity of this issue is demonstrated by Nevins's testimony, in which he claims that "Pro Engineering's plans did not give proper specifications for the equipment needed to precisely adjust" the air flow and he claimed that the "[c]lean hallway system was not filtered nor was volume regulation. Improper instructions were given as to how the system was to be balanced."

[¶55.] Average laypersons would not be knowledgeable regarding the type of equipment necessary to adjust pressure and airflow. Nor would they necessarily know what "volume regulation" means or why it is significant to the alleged negligence and issues with the Facility. To be sure, this Facility is unique in that it was constructed in part for the purpose of creating and testing animal vaccines, which required certain specifications for airflow inside the building by keeping dirty (contaminated) air out of certain rooms. *See Brooks Oil Serv. v. Rogers*, No. LLICV095005394S, 2011 WL 6004377, at *2 (Conn. Super. Ct. Nov. 15, 2011)

(unpublished opinion) ("Whether a licensed HVAC contractor has defectively installed a heating and air conditioning system is beyond the ordinary knowledge and experience" of laypersons); *cf. Mid-W. Elec., Inc. v. DeWild Grant Reckert & Assocs. Co.*, 500 N.W.2d 250, 255 (S.D. 1993) (holding it was "within the understanding of the ordinary layman that failure to review plans and specifications or failure to submit a required form noting variance from specifications may fall below a professional standard"). Without expert testimony to establish that Pro Engineering "failed to provide ventilation, movement of air, reverse flow, balancing system, [and] pressurizing," RTI cannot establish its claims against Pro Engineering. The court properly granted summary judgment in favor of Pro Engineering.

### c.    *FM Acoustical's motion for summary judgment*

[¶56.]    FM's role was to install the ceiling in the Facility, which RTI claims was done incorrectly and not in compliance with the installation instructions. RTI claims some of the suspension wires were not connected, some tiles were not clipped fully or at all, and there were gaps around the outside framing. Some of the ceiling wires allegedly snapped as the ceiling moved up and down. RTI admitted it would need an expert "to determine if deficiencies in material or installation existed."

[¶57.]    Beyond the fact that most laypersons may lack adequate knowledge regarding construction deficiencies in general, the activities for which this Facility was designed are unique, requiring a particular type of ceiling. An average layperson would not have the requisite knowledge or experience to determine whether a particular ceiling was installed correctly, or what caused or contributed

to the ceiling collapse. *See, e.g., Canale v. KBE Bldg. Corp.*, No. UWYCV156026262S, 2017 WL 4621399, at *4 (Conn. Super. Ct. Sept. 5, 2017) (unpublished opinion) ("Determining the proper way to install, fasten, inspect, test, and design a ceiling are all beyond the purview of the ordinary fact finder."). We, therefore, agree with the circuit court's decision to grant summary judgment because RTI's claim against FM also requires expert testimony.

### d. Trane's motion for summary judgment

[¶58.] The circuit court concluded that "RTI's failure to produce an expert as to why the products provided by Trane were defective or caused the damages that resulted are fatal to their claims and required the [c]ourt to grant summary judgment." However, Trane argued to the circuit court, both in its briefing and at the hearing, that as a matter of law, Trane did not breach its contractual obligations to RTI and it did not breach any warranties owed to RTI. Trane did not base its motion on RTI's failure to present expert testimony to support its claims against Trane.[5]

[¶59.] Even on appeal, Trane has not presented any argument that RTI's claims were properly dismissed on summary judgment for failure to support those

---

5. During the summary judgment proceedings, Trane did not dispute RTI's contention that Trane acted negligently when it "wired the system backwards causing the air to circulate in reverse." Trane also has not challenged that assertion on appeal, noting that a "summary judgment motion is not the place to argue disputes of fact." As the party moving for summary judgment however, Trane "has the burden of clearly demonstrating an absence of any genuine issue of material fact and an entitlement to judgment as a matter of law." *Est. of Olsen,* 2024 S.D. 39, ¶ 12, 9 N.W.3d at 768 (citation omitted).

claims with expert testimony.[6]  Instead, Trane argues that it "presented undisputed evidence that [it] satisfactorily fulfilled the terms of its contract with Ekern" and "RTI had no evidence to present a question of fact on whether Trane breached a contractual obligation of any kind."

[¶60.]         However, there are facts in the record suggesting that Trane mistakenly wired the controller backward causing the system to operate improperly.  In its statement of undisputed material facts, Trane averred:

> Nevins explained that the alleged problems for which RTI has included Trane as a defendant in this lawsuit were a general claim that the equipment Trane had provided was "inadequate," along with a "primary complaint" about the way that the HVAC system was originally wired – *i.e.*, that Trane had told RTI that "the wires were reversed on the connection."

RTI disputed this statement with citations to the record:

> Disputed.  Trane admitted [it] wired the original system backward which caused the system to not operate and function as intended and led to contamination.  Further, Nevins's testimony and the written discovery responses can be reconciled as the system installed by Trane did not, in conjunction with the services performed by other Co-Defendants, function as intended.

Trane also claimed the following was an undisputed fact:

> Nevins further testified that RTI's claim that the equipment provided by Trane was not fit for its ordinary purpose was not because of the equipment itself, and what it was, but "[b]ecause of the way it was operating."

RTI also disputed this statement:

---

6.      Trane has argued on appeal that the circuit court properly denied RTI's motion to amend the complaint based on futility for lack of expert testimony to support the claim RTI sought to add.  The motion to amend is discussed below.

> Disputed. This statement is unclear. Nevins testified that the equipment installed by Trane "was drawing the ceiling up and down, to the extent that it could sometimes raise a foot and drop and break wires and collapse. So to me that is something with the ventilation equipment or system or controls."

[¶61.] RTI's allegations, which we view in the light most favorable to RTI, along with Nevins's sworn testimony about the cause of the problems with the ventilation system[7] and his observations of the ceiling, satisfied RTI's obligation in opposing Trane's motion for summary judgment. *See Est. of Olsen*, 2024 S.D. 39, ¶ 17, 9 N.W.3d at 769 (The party opposing summary judgment must "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Trane did not address the purported error in the installation of the controller in moving for summary judgment, and particularly did not address the issue as it related to RTI's claim for negligence in RTI's proposed amended complaint. Given the existence of this purported error in installation, the circuit court erred in granting summary judgment in favor of Trane.[8]

> e.  *Ekern's motion for summary judgment*

[¶62.] RTI, through Nevins, admitted that Ekern's plumbing work on the project is not at issue. Instead, RTI asserts that Ekern's liability rests entirely on a theory of vicarious liability for its subcontractor's (Trane's) defective work. RTI

---

7.  In this regard, Nevins testified that the ventilation system was wired backwards, which Nevin testified Trane admitted.

8.  We make no determination whether Trane's purported error creates a cause of action for breach of contract, breach of warranty, and/or negligence, but given our determination that the circuit court abused its discretion in denying RTI's motion to amend the complaint, these arguments should be better developed by both parties before the circuit court.

advanced its vicarious liability theory of recovery against Ekern for the first time when opposing Ekern's summary judgment motion, arguing Ekern was liable for Trane's faulty work. The circuit court did not address this theory but, instead, analyzed only whether Ekern could be held liable for its own faulty workmanship. The court concluded that RTI was required to produce expert testimony to support its claim that Ekern's work was defective. However, this conclusion applies only to a claim of faulty workmanship, which is not the basis of RTI's claim against Ekern and would not preclude RTI's claim that Ekern is vicariously liable for Trane's alleged faulty workmanship.

[¶63.]       RTI advanced a theory of liability on which it is entitled to a legal determination, whether by the circuit court as a matter of law, if applicable, or by a jury. Because the circuit court did not address this theory of recovery against Ekern, we conclude that Ekern was not entitled to summary judgment. *First Nat. Bank v. Felt*, 368 N.W.2d 588, 592 (S.D. 1985) (In reversing summary judgment on claims first asserted at the summary judgment stage, which the circuit court failed to address, we held the defendants were "entitled to be heard on these claims."). This is particularly true given our decision below to reverse the court's denial of RTI's motion to amend its second amended complaint, meaning RTI will be able to assert a negligence claim against Trane on remand. We offer no opinion on whether RTI could ultimately prevail on its vicarious liability or contractual claims against Ekern, but hold only that RTI was entitled to be heard on this claim and Ekern should not have been dismissed on summary judgment.

### 2. Whether the circuit court abused its discretion in concluding that Nevins was not qualified as an expert witness.

[¶64.]     Because we conclude that RTI was required to support its claims against designArc, Pro Engineering, and FM with expert testimony, we must also consider whether Nevins, RTI's only disclosed expert, was qualified as an expert witness. The circuit court concluded that Nevins was not so qualified.

[¶65.]     "The standard of review for a trial court's qualification of an expert witness is abuse of discretion." *People ex rel. O.S.*, 2005 S.D. 86, ¶ 7, 701 N.W.2d 421, 424 (citation omitted). We have explained that to be qualified as an expert witness, one must have "special knowledge, skill, experience or training" in order "to perceive, know or understand the matter concerning which the witness is to testify." *Id.* (citation omitted).

[¶66.]     In discovery, RTI disclosed Nevins as its only expert witness, stating Nevins "may have personalized knowledge and expertise within the role of CEO *to testify as to Plaintiff's monetary damages in this case*." (Emphasis added). RTI's attempted use of Nevins as an expert witness, however, goes far beyond simply establishing its alleged damages, the only identified area of Nevins's expertise.

[¶67.]     The circuit court concluded: "While Mr. Nevins may have experience with testimony regarding animal building ventilation, this does not qualify him to be an expert regarding the appropriate ceiling that should have been designed for this project. He is not an architect and cannot provide testimony on the proper standard of care for this case." The circuit court also found that Nevins admitted that he was not an expert in ceiling systems.

[¶68.]     Nevins's own testimony supports the circuit court's determination that Nevins was not qualified to offer expert testimony regarding the defendants' alleged faulty workmanship or the quality of the ceiling materials and its installation. Nevins testified that "as a layperson" he believes the HVAC system Trane installed was not fit for its ordinary purpose because "of the way it was operating." But he testified repeatedly that he did not have the expertise to testify about many of the technical aspects underlying RTI's claims against the other defendants. Nevins testified that he did not know whether the HVAC system installed contained "the wrong equipment." Nevins also testified he is not an engineer, HVAC installer, or supplier and that he has no engineering or actual installation experience. He acknowledged that what the "HVAC system was capable of with the sensors and without the sensors" was beyond his expertise. Nevins also admitted that he is not a design engineer and that he lacked expertise regarding whose responsibility it was to know or determine the correct material that should have been used for the ceilings in the Facility. As to the ceiling issues, Nevins testified a ceiling engineering expert was required, but that RTI had not retained an expert of that nature to inspect and opine as to what caused the wires to snap or come loose. He believed, however, it "was fairly obvious what was causing it."

[¶69.]     This testimony reflects Nevins's lack of technical knowledge about the requirements of the design and engineering components of several aspects of the Facility. As such, Nevins could not competently testify about the defendants' particular acts or omissions on which RTI bases its breach of contract and breach of implied warranty claims. The circuit court's determination that Nevins was not

qualified to serve as the requisite expert for RTI's claims against designArc, Pro Engineering, and FM was not an abuse of discretion.

[¶70.]        When expert testimony is required, the failure to produce expert opinions is fatal to a litigant's case. *Luther*, 2004 S.D. 1, ¶ 12, 674 N.W.2d at 345; *Zhi Gang Zhang v. Rasmus*, 2019 S.D. 46, ¶ 41, 932 N.W.2d 153, 165. The circuit court did not err in granting summary judgment to designArc, Pro Engineering, and FM. However, there are genuine issues of material fact relating to RTI's breach of contract and breach of implied warranty claims against Trane, and the court did not address RTI's vicarious liability claim against Ekern. The court, therefore, erred in granting summary judgment to Trane and Ekern.

### 3.    *Whether the circuit court abused its discretion in denying RTI's motion to amend the complaint.*

[¶71.]        RTI moved to amend its second amended complaint, seeking to add what RTI labels a "negligence" claim against Trane, and specifically alleging a vicarious liability action against Ekern. Pursuant to SDCL 15-6-15(a), "a party may amend his pleading only by leave of the court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *See Fodness*, 2020 S.D. 43, ¶ 30, 947 N.W.2d at 629. We have held that "SDCL 15-6-15(b) allows amendment of the pleadings to conform to the evidence. The test for allowing an amendment under SDCL 15-6-15(b) is whether the opposing party will be prejudiced by the amendment; i.e., did he have a fair opportunity to litigate the issue, and could he have offered any additional evidence if the case had been tried on the different issue." *Isakson v. Parris*, 526 N.W.2d 733, 736 (S.D. 1995) (citation modified). "A motion to amend is addressed to the sound discretion of the trial court

and will not be disturbed absent a clear abuse of discretion which results in prejudice to the non-moving party." *Kjerstad v. Ravellette Publ'ns, Inc.*, 517 N.W.2d 419, 423 (S.D. 1994) (citation omitted).

[¶72.]       The circuit court denied RTI's motion to amend as untimely, noting the motion to amend was filed a year and a half after the deadline for doing so, after the completion of discovery, and after the motions for summary judgment were filed. The circuit court also denied the motion to amend based on futility, stating, "any amended pleading to allege tortious conduct on behalf of Trane and vicarious liability as to Ekern would not cure the Plaintiff's failure to submit expert testimony in this case."

[¶73.]       Based on our reasons for reversing summary judgment in favor of Trane and Ekern, RTI's proposed amended claims against Trane for negligence and against Ekern for vicarious liability are not futile. As to Trane and Ekern, genuine issues of material fact remain regarding Trane's negligence and Ekern's attendant vicarious liability. As such, the negligence claim that RTI sought to assert against Trane by the motion to amend is not futile.

[¶74.]       And importantly, there is no evidence that the proposed amendments would cause any prejudice to Trane or Ekern and the circuit court noted none. In fact, both Trane and Ekern have known for some time that Trane's alleged negligence and Ekern's vicarious liability were at issue. *See, e.g.*, *Noble for Drenker v. Shaver*, 1998 S.D. 102, ¶ 15, 583 N.W.2d 643, 647 (holding justice required that plaintiff be allowed to amend her complaint, noting the parties were on notice of the claim sought to be added "from nearly the beginning" and noting the defendants

had already addressed the new claim); *Isakson*, 526 N.W.2d at 736 (affirming the amendment of complaint, noting the defendant "was aware of the statutory claim two months before trial and had sufficient time to defend the claim despite being denied a continuance. He has not demonstrated that he has been unfairly prejudiced by this amendment."). Further, while certain deadlines passed before the motion to amend was filed, the case had not been set for trial.

[¶75.] In short, Trane and Ekern have not established the most important consideration on a motion to amend—that they will suffer any hardship because of RTI's amendment. *See id.* Under these circumstances, the circuit court's denial of the motion to amend was a fundamental error of judgment and outside the reasonable range of permissible choices. *See Fodness*, 2020 S.D. 43, ¶ 32, 947 N.W.2d at 630.

**Conclusion**

[¶76.] The systems at issue in this case involve specialized equipment, processes, parts, and services. Expert testimony is, therefore, required for RTI to sustain its claims against designArc, Pro Engineering, and FM, and Nevins lacks the expertise required to provide such testimony. Accordingly, as to those defendants, the circuit court properly granted summary judgment.

[¶77.] However, RTI has alleged facts that if proven, support its causes of action for breach of contract and breach of implied warranties against Trane. RTI has also alleged that Ekern is vicariously liable for Trane's defective work—a claim that the circuit court failed to address. The circuit court, therefore, erred in granting Trane's and Ekern's motions for summary judgment.

[¶78.] Finally, the negligence claim that RTI sought to assert against Trane, and the vicarious liability claim against Ekern are not futile. And Trane and Ekern have not shown that they would be prejudiced by the proposed amendments. Accordingly, the circuit court erred in denying RTI's motion to amend the complaint.

[¶79.] To summarize, we affirm the court's order granting summary judgment to designArc, Pro Engineering, and FM. We reverse the circuit court's order granting Trane's and Ekern's motions for summary judgment and the circuit court's denial of RTI's motion to amend its complaint. The matter is remanded for further proceedings consistent with this opinion.

[¶80.] Affirmed in part and reversed in part.

[¶81.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.